## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF PENNSYLVANIA

JEREMY PINSON,

      Petitioner,

      v.

D. CHRISTENSEN,

      Respondent.

CIVIL ACTION NO. 1:24-cv-00106

(SAPORITO, J.)

## MEMORANDUM

Jeremy Pinson, currently incarcerated at FCI Butner, proceeds on a petition for a writ of *habeas corpus* submitted pursuant to 28 U.S.C. § 2241 (Doc. 1), challenging a disciplinary sanction she[1] received at USP Tucson. Pinson filed a motion to conduct discovery and supplement the record, which was granted in part and denied in part. *See* (Docs. 12, 17). Pinson now requests reconsideration of that order. (Doc. 18). Finding that the record, even with Pinson's proposed discovery, precludes any entitlement to habeas relief, the Court will deny Pinson's motion for reconsideration and dismiss the petition.

---

[1] The record indicates that Pinson identifies as a transgender female, and the parties use female pronouns throughout briefing.

I.    BACKGROUND

A. Treatment Group Incident

Pinson's sanction arose from an altercation with BOP psychologist Samantha Licata during a February 23, 2023, "treatment group" session in the USP Tucson Special Housing Unit ("SHU"). Pinson was confined to an individual enclosure during the group session. Pinson allegedly[2] became angry because Dr. Licata was "questioning her about her communications with the news media and about her litigation against the BOP." Pinson alleges that Dr. Licata said: "[H]ow dare you threaten to sue me, I[']m going to make your life a living hell." It is undisputed that Pinson yelled: "Get me the f*ck out of here, and get on the radio and get out now and get the officer, and get me the f*ck out of here."

Seven days later, Dr. Licata drafted an "Incident Report," further alleging that Pinson stood up, "postured" with a milk of magnesia bottle in her hand, and "threatened to throw the bottle at [Dr. Licata] if [Pinson] was not immediately returned to her cell." The report also alleged that Pinson threatened to "get herself out" if Dr. Licata did not, and she threw

---

[2] Pinson disputes the respondent's version of events through her petition, briefing, and multiple declarations.

a workbook[3] as Dr. Licata was leaving. Based on this report, Pinson was charged with "Disciplinary Code 203, Threatening Bodily Harm."

## B. Disciplinary Hearing

The charge was ultimately referred to a Disciplinary Hearing Officer ("DHO"). On the "Notice of Hearing," Pinson listed only three witnesses, but she claims she was prevented from presenting 11 additional witnesses.[4] Pinson further alleges that "Ms. Flores," who handed out witness statement forms, told two witnesses: "[Y]ou don't want to testify for Pinson, but you can."

The hearing was held on April 5, 2023. Pinson alleges that the hearing officer, Antoinetta Estrada, was a "personal friend" of Dr. Licata, and a former coworker in the USP Tucson psychology services

---

[3] The report is ambiguous as to whether the book hit the wall of Pinson's individual cell, or of the larger room. While the respondent argues that the book hit a wall "outside of her enclosure," Pinson claims she was "fully enclosed" in her cell, which had "no single opening greater than 1/2 inch." *See* (Doc. 5-1, ¶ 2; Doc. 9 at 3; Doc. 9-8 at 2).

[4] While Pinson claims she listed three witnesses because the form only had space for three names (Doc. 5-1, ¶ 6), the form clearly instructs: "If additional space is needed, use the reverse side of this form." *See* (Doc. 9-7). Nonetheless, in her discovery motion, Pinson sought to obtain declarations from witnesses stating that Pinson asked them to testify but "staff told them [the DHO] said no."

department. Pinson alleges that at the beginning of the hearing, Estrada said: "I can't wait to hear what lawyer bullsh*t you have for me today." Pinson alleges that Estrada also "made a number of statements such as: (1) 'My staff don't lie, inmates lie'; (2) 'Inmates always claim their [sic] innocent and they never are'; (3) 'I[']m sure I'll end up in court over this but I'm taking you down'; (4) 'The Warden wants you gone'." On the issue of additional witnesses, Pinson alleges that Estrada said: "I[']m not gonna listen to a bunch of nonsense you put these inmates up to."

Pinson's three witnesses were permitted to make written statements, but there was no live witness testimony or questioning. Although Pinson claims she received "no explanation" for this, the record indicates that Pinson had her due process rights explained to her, signed a form accepting written testimony "in lieu of a verbal statement," waived her right to live witnesses, and "was ready to proceed with" the hearing. *See* (Doc. 9-4 at 3-4, Doc. 9-5 at 2). One witness, Pinson's cellmate, wrote that "there was no screaming about threat[en]ing, fighting, or any thing that can be a cause [of] bodily harm to anyone[,] staff or inmate." This witness in turn quoted another inmate as saying: "It's f*cked up what they doing to your [cellmate]. She didn't do or say sh*t like that." A second

witness wrote only that Pinson "didn't actually do anything against the rules that I saw." Pinson's third witness declined to give a statement. Pinson herself made a verbal statement at the hearing: "I just got angry. I wanted to go back to my cell. My beef is not that I didn't say those things, but that was her perception."

### C. Disciplinary Findings

Estrada found that Pinson had committed the offense of Threatening Bodily Harm (Attempting)[5]. In a written report, Estrada found that no witness provided competent testimony to support Pinson's story. Pinson's cellmate, who claimed there had been no "screaming about threat[en]ing," was out of earshot of the incident. Pinson admitted at the hearing that the witness made his statement "based on what [Pinson] had told him." The second witness, who simply stated that Pinson "didn't actually do anything against the rules that I saw," provided no factual elaboration. Pinson does not dispute these findings.

---

[5] Pinson did not contest the amendment of the charge from Threatening Bodily Harm, Disciplinary Code 203, to Threatening Bodily Harm (Attempting), Disciplinary Code 203A.

Estrada also reviewed surveillance footage[6] that showed Dr. Licata turning her head toward Pinson's enclosure, then "abruptly" leaving the room, before SHU staff arrived on the scene. The video did not show Dr. Licata saying anything, and Estrada inferred that Pinson "shouting so loud" was what alerted the SHU staff to intervene. Estrada found that the credibility of Dr. Licata's report was enhanced because it was made in the course of her professional duties, and that staff are considered more credible than prisoners because "they are morally and legally obligated to submit truthful statements and would not stand to gain by doing otherwise." Further, Estrada noted that Pinson had a documented "history of insolence, staff assaults, and threats toward staff," which demonstrated her "willingness to engage in this type of behavior." Ultimately, Pinson received 30 days of disciplinary segregation, lost 27 days of good time credit, and lost 120 days of commissary privileges.

### D. Administrative Remedies

Pinson appealed the disciplinary sanction. To challenge the result

---

[6] Pinson alleges that Estrada "refused to watch a video from a second camera," but does not explain what that video purportedly showed or how it would have altered the result.

of a disciplinary hearing, the Bureau of Prisons provides a two-step grievance process. First, the inmate must file an appeal to the Regional Director (BP-10). If that appeal is denied, the inmate may appeal to the BOP's Central Office (BP-11), attaching all lower-level submissions and responses. The appeal is considered exhausted when it is decided on its merits by the Central Office.

BOP records show that Pinson's BP-10 appeal was denied by the Regional Director. Pinson filed a BP-11 appeal, but did not attach any lower-level documentation, asserting that she never received a response to her BP-10 appeal. Pinson alleges that such responses are supposed to be delivered to inmates with a signed receipt, but that receipt is not in the record. Pinson's BP-11 appeal was rejected with instructions to resubmit with the BP-10 response, but those instructions did not address Pinson's claim that she never received that response. Pinson did not file any further appeal from that point.

### E. Petition and Procedural History

In her petition and memorandum of law, Pinson asserts three grounds for relief:

- Pinson's disciplinary sanction violated the First Amendment

in that it punished her for protected speech;

- The alleged refusal to permit 11 additional witnesses violated Pinson's due process rights;

- Pinson was denied an impartial decision-maker, violating her due process rights.

The respondent argues that Pinson did not exhaust administrative remedies and would not be entitled to relief on the merits. After the response was filed, Pinson sought leave to conduct discovery to "prove that she did not receive the copy of the [BP-10] response"; obtain declarations from 11 inmates to confirm that they were not permitted to testify on her behalf; and obtain discovery showing that Estrada's disciplinary reports consistently find that prison staff are more credible than inmates. The Court denied Pinson's request to conduct discovery but permitted the parties to supplement the record on the issue of administrative remedies. Neither party filed any additional material, and the petition is now ripe for resolution.

## II.   LEGAL STANDARDS

In *Wolff v. McDonnell*, 418 U.S. 539 (1974), the United States Supreme Court acknowledged that the loss of good time credits may

create a liberty interest protected by the Due Process Clause. The prisoner's due process rights are limited to: 1) an impartial decision-making body; 2) twenty-four hour advance notice of the charges; 3) an opportunity to call witnesses and present documentary evidence; 4) assistance from a representative; and 5) a written decision explaining the evidence relied upon. 418 U.S. at 563-67. In addition, due process requires that a prison disciplinary decision implicating an inmate's liberty interest must be supported by at least "some evidence." *Superintendent v. Hill*, 472 U.S. 445, 454-55 (1985).

Pinson's motion for reconsideration of the Court's order denying discovery is necessarily brought pursuant to Rule 54(b) of the Federal Rules of Civil Procedure. *See Qazizadeh v. Pinnacle Health Sys.*, 214 F. Supp. 3d 292, 295 (M.D. Pa. 2016); *see also* Fed. R. Civ. P. 81(a)(4) (applying the Federal Rules of Civil Procedure to habeas cases). Under Rule 54(b), "[a]n order that does not dispose of every claim in an action 'may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities.'" *Clark Distrib. Sys., Inc. v. ALG Direct, Inc.*, 12 F. Supp. 3d 702, 717 (M.D. Pa. 2014) (quoting Fed. R. Civ. P. 54(b)); *see also Qazizadeh*, 214 F. Supp. 3d at 295.

Reconsideration of interlocutory orders "may be had even if a movant cannot show an intervening change in controlling law, the availability of new evidence that was not available when the court issues the underlying order, or 'the need to correct a clear error of law or fact or to prevent manifest injustice.'" *Qazizadeh*, 214 F. Supp. 3d at 295 (quoting *Max's Seafood Café ex rel. Lou-Ann, Inc. v. Quinteros*, 176 F.3d 669, 677 (3d Cir. 1999)). "Instead, the court may permit reconsideration whenever 'consonant with justice to do so.'" *Id.* (quoting *St. Mary's Area Water Auth. v. St. Paul Fire & Marine Ins. Co.*, 412 F. Supp. 2d 630, 632 (M.D. Pa. 2007)); *see also Clark Distr. Sys.*, 12 F. Supp. 3d at 717 (citing *United States v. Jerry*, 487 F.2d 600, 605 (3d Cir. 1973)). Nevertheless,

> [b]efore entertaining a motion for reconsideration of an interlocutory order, the movant must still establish good cause for why the court should revisit its prior decision. Moreover, whether involving a final or interlocutory order, a motion for reconsideration is not to be used as a means to reargue matters already argued and disposed of or as an attempt to relitigate a point of disagreement between the Court and the litigant. A reconsideration motion should not be used to try to get a second bite at the apple or to raise new arguments or evidence that could have been proffered prior to the issuance of the order in question.

*Qazizadeh*, 214 F. Supp. 3d at 295-96 (citations and internal quotation marks omitted).

III.   DISCUSSION

A. Administrative Remedies

The respondent argues that dismissal is required because Pinson did not exhaust administrative remedies. Although "there is no statutory exhaustion requirement attached to § 2241" itself, the Third Circuit Court of Appeals has "consistently applied an exhaustion requirement to claims brought under § 2241." *Callwood v. Enos*, 230 F.3d 627, 634 (3d Cir. 2000). However, a prisoner is only required to exhaust administrative remedies that are "available." *See Rinaldi v. United States*, 904 F.3d 257, 268 (3d Cir. 2018) (citing *Woodford v. Ngo*, 548 U.S. 81, 93 (2006)). As relevant here, a remedy may be unavailable when it "operates as a simple dead end" or when the prisoner relies on an objectively misleading representation about the grievance process from prison staff. *See Hardy v. Shaikh*, 959 F.3d 578, 584-87 (3d Cir. 2020) (quoting *Ross v. Blake*, 578 U.S. 632, 643 (2016)).

Based on the limited record, which does not clearly show whether Pinson received the response to her BP-10 appeal, the Court declines to dismiss the petition on these grounds. The respondent argues that receipt of the response is moot, because the grievance process provided an

avenue for Pinson to "appeal the rejection of her BP-11 . . . by resubmitting it and explaining that she hadn't received a copy of the BP-10 denial." (Doc. 19 at 2). However, the basis for this argument is unclear. The relevant rules, as identified by the respondent, provide:

> (a) *Rejections.* The Coordinator at any level (CCM, institution, region, Central Office) may reject and return to the inmate without response a Request or an Appeal that is written by an inmate in a manner that is obscene or abusive, or does not meet any other requirement of this part.

> (b) *Notice.* When a submission is rejected, the inmate shall be provided a written notice, signed by the Administrative Remedy Coordinator, explaining the reason for rejection. If the defect on which the rejection is based is correctable, the notice shall inform the inmate of a reasonable time extension within which to correct the defect and resubmit the Request or Appeal.

> (c) *Appeal of rejections.* When a Request or Appeal is rejected and the inmate is not given an opportunity to correct the defect and resubmit, the inmate may appeal the rejection, including a rejection on the basis of an exception as described in § 542.14(d), to the next appeal level . . .

28 C.F.R. § 542.17. Under subsection (c), the prisoner can "appeal . . . to the next appeal level" when she is "not given an opportunity to correct the defect and resubmit." § 542.17(c). That section does not apply here, because Pinson was given an "opportunity" to resubmit. Moreover, BP-11 was the last stage of appeal, *see* (Doc. 9 at 8 n.3, citing 28 C.F.R. § 542.15),

so there was no "next level" for Pinson to appeal to.

Instead, because Pinson was explicitly permitted to resubmit, subsection (b) applies. However, nothing in that subsection permitted Pinson to "appeal the rejection . . . by explaining that she hadn't received a copy of the BP-10 denial." Rather, it simply provides that the prisoner should receive "a reasonable time extension within which to correct the defect." § 542.17(b). Any relief these rules could have provided is not apparent from the plain text.

Moreover, the respondent's argument that Pinson should have "explained" that she had not received the BP-10 response ignores that she had already done so in her initial BP-11. *See* (Doc. 9-11 at 1 ("It has been well over 60 days without a response...")). The Central Office's response to Pinson's explanation was a form rejection instructing Pinson to "resubmit [her] appeal *in the proper form* . . .". (*Id.* at 3) (emphasis added). Given Pinson's prior explanation, this instruction was the equivalent of a dead end. Even if some other step was available to Pinson under the BOP's administrative procedures, the contradictory instruction to resubmit "in the proper form" would make this remedy "so opaque as to be incapable of use and objectively confusing." *See, e.g., Ford v. Wood,*

No. 1:20-CV-02333, 2023 WL 2287715, at *6-7 (M.D. Pa. Feb. 27, 2023) (remedies unavailable where "the Central Office's misleading instructions coupled with the governing regulations provided Plaintiff with no clear path to further exhaustion").

## B. First Amendment

Turning to the merits, Pinson first argues that she was disciplined for protected speech in violation of the First Amendment, because her verbal remarks did not constitute an explicit threat, and she did not subjectively intend for the language she used to threaten Dr. Licata.

A prisoner retains First Amendment rights only to the extent those rights are "not inconsistent with [her] status as a prisoner or with the legitimate penological objectives of the corrections system." *Wisniewski v. Fisher*, 857 F.3d 152, 156 (3d Cir. 2017) (quoting *Pell v. Procunier*, 417 U.S. 817, 822 (1974)). As noted in the hearing report, threats or "attempted" threats against staff "seriously detract[] from the staff member's ability to maintain control," which is inconsistent with a correctional environment, "and could encourage other inmates into similar action." (Doc. 9-4 at 6). Thus, Pinson's First Amendment rights do not extend to threats and abuse of staff. *See, e.g., Lewis v. Canaan*,

664 F. App'x 153, 155 (3d Cir. 2016); *Torres v. Clark*, 522 F. App'x 103, 106 (3d Cir. 2013) (prisoner's "abusive, obscene, or inappropriate language . . . plainly violated the prison's permissible restriction on [his] First Amendment rights").

Further, while Pinson argues that saying "get me the [f*ck] out of here" was not itself a "threat," (Doc. 5 at 6-8), this ignores the DHO's findings that Pinson threatened to "get herself out of this cell if [Dr. Licata] did not," "postured" to throw a bottle at Dr. Licata, and threw a workbook as Dr. Licata was exiting the room.

### C. Witness Testimony

Next, Pinson argues that Estrada's alleged refusal to permit 11 additional witnesses violated her due process rights. Assuming *arguendo* that Estrada did refuse the witnesses, Pinson is not entitled to relief. "Prison officials have broad discretion in administering a disciplinary hearing, and it is not a denial of due process to deny an inmate an opportunity to present witnesses whose testimony would be irrelevant, repetitive, or unnecessary." *Moles v. Holt*, 221 F. App'x 92, 95 (3d Cir. 2007); *see also Campbell v. Warden Allenwood USP*, 808 F. App'x 70, 72-73 (3d Cir. 2020).

Pinson does not explain why the 11 witnesses would have offered different or better testimony than the three who were permitted. *See Moles*, 221 F. App'x at 95 ("Moles does not explain how the testimony of the absent witnesses would have been materially different from the testimony of the three witnesses whom he called at the hearing."). In seeking reconsideration to obtain declarations from these would-be witnesses, Pinson now claims that they "could have offered [ ] different, credible testimony" (Doc. 18 at 2-3), but still does not explain what specifically they "could have" said, or why they would have provided competent, material evidence when her first choice witnesses were unable or unwilling to do so.

Due process does not require that Pinson be allowed to "contact every inmate who witnessed the incident and request their appearance at the disciplinary hearing," merely because she claims they "would have disputed the [DHO's] version of events." *Moles*, 221 F. App'x at 95; *see also Lasko v. Holt*, 334 F. App'x 474, 476 (3d Cir. 2009). Any decision not to call 14 witnesses for a single disciplinary hearing was thus well within Estrada's "necessary discretion to keep the hearing within reasonable

limits."[7] *Wolff*, 418 U.S. at 566.

### D. Impartial Decision-maker

Finally, Pinson argues that she was denied an impartial decision-maker. This requirement is narrowly construed, prohibiting "only those officials who have a direct personal or otherwise substantial involvement, such as major participation in a judgmental or decision-making role, in the circumstances underlying the charge." *Meyers v. Alldredge*, 492 F.2d 296, 306 (3d Cir. 1974); *see also* 28 C.F.R. § 541.8(b).[8]

Pinson's argument consists of a series of allegations that, even if taken as true, would not show DHO Estrada's direct or substantial involvement "in the circumstances underlying the charge." Pinson's

---

[7] In seeking reconsideration, Pinson now argues that discovery would show that Estrada routinely excludes witness testimony as a "pattern and practice," but Pinson did not make that argument in her original motion and brief. *See* (Docs. 12, 15); *Qazizadeh*, 214 F. Supp. 3d at 295-96 ("A reconsideration motion should not be used to try to get a second bite at the apple or to raise new arguments."). Regardless, that fact would not show a deprivation of Pinson's due process rights.

[8] Pinson's argument that the standard articulated in *Meyers* was somehow undermined by the Supreme Court's later decision in *Wolff* is without merit. *See, e.g., Lasko v. Holt*, 334 F. App'x 474, 476 (3d Cir. 2009) (affirming because "the District Court correctly concluded that Lasko had failed to demonstrate partiality under *Meyers*") (citations omitted).

allegations that Estrada was a "personal friend" of Dr. Licata, and that they used to work in the same department, are insufficient.[9]

Pinson attributes various comments to Estrada that, if accepted as true, suggest a general distrust of prisoner witness statements, and of Pinson's account specifically. But the requirement of an "impartial decision-maker" does not mean that prisoners' statements must be accepted as credible or weighed equally with those of staff. *See Benson v. United States*, 625 F. App'x 20, 23 (3d Cir. 2015) ("A challenge to the weight accorded evidence is not relevant . . . because the standard does not require weighing of the evidence.") (quotation marks omitted); *Moles*, 221 F. App'x at 95 (DHO's alleged "hostility towards the defense witnesses and undue deference towards [the] incident report" did not

---

[9] *See, e.g., Beasley v. N'Diaye*, No. 22-CV-585 (RMB), 2023 WL 3720843, at *7 (D.N.J. May 30, 2023) (allegation that DHO "remain[ed] affiliated with his [former] correctional officer colleagues," including officers involved in the incident, did not show denial of an impartial tribunal); *Lewis v. Warden, U.S.P. Canaan*, No. 3:14-CV-2325, 2016 WL 3156313, at *2 (M.D. Pa. June 3, 2016) (allegation of DHO's "personal relationships with prison staff members" was insufficient), aff'd, 664 F. App'x 153 (3d Cir. 2016); *see also Benson v. United States*, 625 F. App'x 20, 23-24 (3d Cir. 2015) (petitioner's allegation that the "DHO was biased against him and inclined to accept [the officer's] account of events over his own because the DHO worked with her" was insufficient).

show a due process violation). Pinson particularly objects to Estrada's statement that staff are considered more credible than prisoners because staff "are morally and legally obligated to submit truthful statements and would not stand to gain by doing otherwise."[10] However, Pinson's disagreement with that reasoning (Doc. 15 at 8-9) does not create a constitutional violation.[11]

Ultimately, Pinson asks the Court to infer bias by analogy to other cases in which hearing officers, by her description, "refused to listen" to the accused, acted "dishonestly," or "prejudge[d] the evidence." The

---

[10] Pinson seeks reconsideration of the Court's order refusing discovery to show that Estrada used "identical or similar language" in other cases. As explained in the prior order, the statement itself is phrased as a general principle that is not specific to Dr. Licata, Pinson, or this case, so its use in other cases can be inferred without discovery.

[11] *See, e.g., Pittman v. Bledsoe*, 462 F. App'x 188, 191 (3d Cir. 2012) (DHO's "finding that the officer was credible because he had no reason to lie about the incident" did not suggest a due process violation); *Desposito v. Warden, FCI Fort Dix*, No. 22-CV-2487 (RMB), 2023 WL 6211994, at *6 (D.N.J. Sept. 25, 2023) (contrasting the "presumption that [an officer] was simply performing his job" with a prisoner's motive to lie created by potential loss of good conduct time); *Stanko v. Ebbert*, No. 4:09-CV-1911, 2011 WL 1466382, at *5 (M.D. Pa. Apr. 18, 2011), *aff'd*, 434 F. App'x 63 (3d Cir. 2011).

extreme situations described in those cases are inapposite.[12] The record shows that in this case, Pinson was permitted a reasonable opportunity to present her defense but did not offer compelling evidence supporting her version of events. Thus, Estrada's alleged "sarcastic and dismissive remarks," even if taken as true, would not establish a due process violation. *See Mendoza v. Tamez*, 451 F. App'x 715, 718 (10th Cir. 2011) (even if DHO's remark suggested bias, "review of a due process challenge based on impartiality is limited to whether such bias deprived the inmate of a meaningful opportunity to present [her] defense").

To the extent Pinson challenges the sufficiency of the evidence against her, "the relevant question is whether there is *any* evidence in the record that could support the conclusion reached." *Hill*, 472 U.S. at 455-56 (emphasis added). There was more than sufficient evidence here, including Dr. Licata's own statement, Pinson's admission that she was "angry" and verbally abused Dr. Licata, the video showing Dr. Licata's

---

[12] *See*, *e.g.*, *Edwards v. Balisok*, 520 U.S. 641, 647-48 (1997) (hearing officer allegedly "lied about the nonexistence of witness statements," as a result of which "all witness testimony in [the prisoner's] defense was excluded"); *Mack v. Johnson*, 430 F. Supp. 1139, 1145 (E.D. Pa. 1977) (prisoner allegedly prevented from making any substantive statement in response to the charges directed at him).

abrupt departure from the room, and Pinson's history of threats to staff.

## IV.  CONCLUSION

For the reasons described above, Pinson's motion for reconsideration will be denied and her petition dismissed. An appropriate order follows.

Dated: July 10, 2025          *s/Joseph F. Saporito, Jr.*
                              JOSEPH F. SAPORITO, JR.
                              United States District Judge